**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**DAVID L. FRICKS,**

vs.                                                                                                  Civil No. 03-449 RLP

**JO ANNE B. BARNHART,
Commissioner of Social Security,**

       **Defendant.**

**MEMORANDUM OPINION AND ORDER**

**I.**     **Background**

1.     David L. Fricks ("Fricks" herein) was born on April 22, 1950. He is a college graduate, and previously worked as a free-lance technical illustrator and laborer. He alleges that he has been disabled since November 1993 due to a mental disorder[1]. Fricks filed applications for supplemental security income (SSI) and disability income benefits (DIB) on May 8, 1995. These applications were denied on August 18, 1995, and no appeal was taken. (Tr. 554, 127). Subsequent applications were filed effective June 27, 2000. He was last insured for DIB through December 31, 1997. (Tr. 108). Fricks' current applications were denied initially and on reconsideration. A hearing was held before an administrative law judge ("ALJ" herein) on February 14, 2002. (Tr. 32). The ALJ denied Plaintiff's claims in a decision dated May 31, 2002. (Tr. 16-26). The Appeals Council subsequently declined review. (Tr. 9).

<u>Psychiatric History Prior to Date of Alleged Onset of Disability.</u>

2.     Fricks' history of mental disorders extends back to 1970, when a military psychiatrist diagnosed paranoid personality disorder and recommended psychotherapy. (Tr. 409). On September

---

[1]Fricks also alleged physical impairments which were found to be nonsevere. He does not challenge this finding.

22, 1989 he requested inpatient treatment for recurrent depression at a Veterans' Administration Hospital in Texas. No diagnosis or treatment were recorded. (Tr. 377). On July 22, 1991, Fricks was treated at the psychiatric outpatient clinic of a Dallas County Hospital, complaining of depression, sleep impairment, loss of interest and social isolation. As of that time he had been on various antidepressant medications for nine years. The treating physician conducted a mental status examination, diagnosed Major Depressive Disorder, with a current GAF[2] of 50-55, past year GAF of 60 (Tr. 170-171), and prescribed Nortriptyline. (Tr. 169). Fricks continued to take medications for depression and anxiety. (Tr. 358-359, 180).

Psychiatric History from November 1993 (Alleged Onset of Disability)
to August 18, 1995 (Prior Denial of Benefits).

3.      Fricks was admitted to Terrell State Hospital on January 19, 1994, and was subsequently transferred to the Veterans' Administration Hospital in Waco, Texas. (Tr. 186-187, 190-192, 318, 296-298). He was depressed, suicidal and angry. His depression responded to medication. Psychiatric testing[3] disclosed a severe personality disorder with borderline features. (Tr. 296, 298).

---

[2] "GAF" or Global Assessment of Functioning is a score is part of the Multiaxial Assessment, which evaluates the type and severity of a mental disorders. The GAF score considers psychological, social and occupational functioning. A GAF score of 50 indicates serious symptoms evidenced by, for example, suicidal ideation, or any serious impairment in social occupational or school functioning, including having no friends or being unable to keep a job. *Diagnostic and Statistical Manual of Mental Disorders,* 4th Ed., p. 32. A GAF score of 51-60 indicates moderate symptoms, such as flat affect and circumstantial speech, or occasional panic attacks, or moderate difficulties in social, occupational or school functioning, such as limited friendships or conflicts with peers or coworkers. *Id.*

[3] The Discharge Summary dated Feb. 2, 1994, summarized the results of psychological testing as follows:

> Psychological testing was obtained and consult indicated a profile indicative of mild to moderate depression and anxiety. Their report stated that individuals with profile typically are dramatic and hysteroid. They are chronically hostile and use projection and acting out as defense mechanism. There was evidence of poor impulse control, substance abuse was likely, and there was a tendency to exploit interpersonal relationships for their own gain. They was (sic) described as argumentative, irritable and obsessive and suspicious and critical of other

On discharge he was diagnosed as suffering from dysthymia and an unspecified personality disorder, and assigned a GAF score of 70[4]. (Tr. 297). He was advised to seek outpatient psychotherapy and to refrain from alcohol. His prognosis was considered guarded. (Tr. 299).

4.     Fricks moved to New Mexico in March 1994. (Tr. 286). He was homeless and jobless when he sought assistance at the Veterans' Administration on July 20, 1994. He denied depression, although he had stopped taking antidepressant medication a month before. He refused referral for mental health evaluation. Id.

5.     On February 8, 1995, Fricks was seen at the Los Alamos Medical Center Emergency Room complaining of insomnia and seeking muscle relaxants. The examining physician noted that Fricks was pleasant and cooperative, would not make eye contact, had logical flow of thoughts and ideas, and did not appear manic. He diagnosed insomnia and "psychiatric disorder" and advised Fricks to make an appointment with the Los Alamos Family Council ("LAFC" herein) to discuss psychiatric treatment. (Tr. 201)

6.     Fricks returned to the Emergency Room three weeks later complaining of depression, insomnia, anger and mood swings. He indicated that he had been evaluated that day by Family Council and told to come to the ER for prescriptions. The examining physician indicated that this

---

people. These people do not feel they receive what they deserve. The patient is felt to have a rather malignant profile that was suggestive of a pre-psychotic or borderline state. Indirect manipulation of anger and hostility were present as well as evidence of violent acting out. It was felt that individuals with this profile are hostile, demeaning, narcissistic, suspicious, self-indulgent, resentful and/or appropriately diagnosed as personality disorder, not otherwise specified or paranoid schizophrenic.

(Tr. 298).

[4]A GAF score of 70 indicates some mild symptoms such as depressed mood and mild insomnia, or some difficulty in occupation, social or school functioning, "but generally functioning pretty well" with some meaningful relationships. *DSM-IV* at 32.

was not verified, and felt that Fricks was depressed and engaging in drug seeking behavior. (Tr. 202).

7.     On May 23, 1995, Fricks was evaluated by Paul Daly, M.D., for digestive problems and hypertension. In his problem list, Dr. Daly noted "depression, resolved." No explanation or clinical findings related to Fricks' mental state were recorded. (Tr. 525).

Psychiatric History from August 18, 1995 (Prior Denial of Benefits)
to December 31, 1997 (Date Last Insured for DIB Benefits).

8.     Fricks returned to Dr. Daly on March 14, 1996. (Tr. 523-524). Dr. Daly noted that Fricks was seeing a Dr. Gilmore for counseling[5] and taking Nortriptyline for treatment of depression. Fricks stated that he was going to school full time, studying computer graphics. On August 5, Fricks was examined at Health Centers of Northern New Mexico. The note indicates that he was taking Nortriptyline and Prozac.

Psychiatric History since December 31, 1997 (Date Last Insured for DIB Benefits)

9.     Although Fricks continued to receive psychotropic medication from the Veterans' Administration, there are no records of mental health care from August 1996 to January 30, 1998, when he was seen by Dr. Barry Weinstein, a psychiatrist at LAFC. (Tr. 511). At that point, Dr. Weinstein began monitoring and prescribing Fricks' medications. Dr. Weinstein felt that Fricks was slightly depressed with some grandiose thinking, but no flight of ideas, pressured speech or delusions. Id. A formal intake assessment for therapy and case management purposes was conducted on May 21, 1998 by Clifford Kroch, LPC. (Tr. 493-506). On mental status exam, Fricks was described as well groomed, with normal mood, cooperative attitude, appropriate affect, normal speech, restless, fully oriented and with intact judgment and insight. He expressed hostility toward several companies

---

[5]The administrative record does not contain any records from a Dr. Gilmore, or any counsling records in this time-frame.

and institutions, and had paranoid tendencies. (Tr. 499).

10.     The administrative record reflects regular counseling sessions commencing in November 1998. On December 8, 1998, Dr. Weinstein described Fricks as irritable but not manic *per se*. He discussed but did not at that time add Depakote to Fricks' medications for greater mood instability.[6] (Compare Tr. 482 with Tr. 474). Attempts were made to obtain assistance for Fricks through the Department of Vocational Rehabilitation, which he declined, causing his counselor to state, "A: David seems unwilling to pursue these avenues that will provide him with gainful employment. P: Will continue to work with David regarding his financial situation. Also will work with  with (sic) him on his pattern of conflict with others." (Tr. 478-479, 476). As of February 22, 1999, Fricks had agreed to work with DVR, and continued to do so for several months. (Tr. 474, 470-471). DVR eventually provided him with computer graphics equipment that he could use to work from home. (Tr. 118).

11.     In May 1999, Fricks' therapist noted that he was "almost manic" (Tr. 465) and "drinking a lot." (Tr. 464, 463). On July 12, 1999, Fricks came to LAFC "in crisis," with many financial problems. (Tr 457-458). He was described as restless, agitated, paranoid, angry, and scattered. On July 14 his therapist wrote:

> Data:  David was still very depressed and continued to speak about the difficult time financially that he has been going through.  He needs money but said that he's not going to get any part time job to get money.  He continued to express frustration about how he is "screwed" in life.  He needs to have his van working so he can drive to Santa Fe to try and sell his art.
> Assessment:  David was angry and depressed about his "lot in life" though financial concerns are paramount he didn't want to get some part time job where the people will "see his intellect and he won't fit in."  He displayed paranoid-delusional thinking.

---

[6]Depakote is utilized in the treatment of patients with bipolar disorder. See http://www.depakote.com/br/dep/dep006.htm.

> Said though he had thought about it, he would not commit suicide.
> Plan: . . . Encouraged him to go out and seek some work to bring money in. He told me that he'd be talking with me.

(Tr. 456).

12. On August 3, 1999, Dr. Weinstein felt Fricks exhibited paranoia without delusions, flight of ideas and mild grandiosity. He stated that Fricks was basically unchanged and suffered from mood disorder. He recommended use of Depakote and continued contact with his family counselor. (Tr. 453). Depakote stabilized Fricks' mood.. (Tr. 451). On September 9, 1999, Dr. Weinstein prepared a short note stating:

> Bipolar disorder-depression
> Paranoid ideation
> Nortriptyline 50 III (illeg)
> LAMC

(Tr. 450).

13. Dr. Weinstein noted Fricks' continued complaints on September 21, and stated "chronic psychological/pers factors still seems to contribute to lack of I-P[7]/vocational success. Still some grandiosity without other signs of manic behavior." (Tr. 449). Fricks' condition was unchanged on October 19, 1999, despite the fact that he decreased his dosage of Depakote and Nortriptyline because of a decrease in libido. Dr. Weinstein again noted that Fricks was grandiose, and became hyper-defensive when this thinking pattern was challenged. He concluded by stating that personality factors made success unlikely. (Tr. 448). On December 10, 1999, Dr. Weinstein indicated that Fricks' status was unchanged. (Tr. 439). On January 25, 2000, Dr. Weinstein indicated that Fricks' mood was generally stable with some bouts of depressed mood due to situational factors

---

[7]Interpersonal.

(job/finances). He altered Fricks' medication dosages due to complaints that current dosages made him too sleepy. (Tr. 437).

14.     On March 29, 2000, Fricks was treated for hypotension at the Los Alamos Medical Center ER. The treating physician noted "He has chronic manic depression disorder, and is taking Depakote 250 mg b.i.d., nortriptyline 25 mg. daily, fluoxetine[8] 20 mg. daily. . ." (Tr. 208, 207-210).

15.     Fricks returned to Dr. Weinstein on March 31, 2000. (Tr. 434). His mood was stable. Dr. Weinstein indicated that he was taking medication generally as prescribed, that he might be using alcohol to excess and that he continued to be isolated with no vocational success. He encouraged Fricks to return to counseling. Fricks returned to his counselor on May 1, reporting that he was working 50 hours a week on his computer art. He complained that without a decent car, he could not do the traveling necessary to promote his art. (Tr. 432).

16.     On June 30, 2000, Dr. Weinstein noted: "Pt's personality and I-P issues precluding any success . . . some grandiose notions re his progress painting. No follow through with even short term goals." (Tr. 430). One month later, Dr. Weinstein noted Fricks' attempts to promote his art work (handing out business cards/preparing brochure), and indicated that his mood disorder was under control with medication. (Tr. 429).

17.     On September 28, 2000, Fricks told Dr. Weinstein that he had been depressed for a month, and had increased his medications on his own. Dr. Weinstein indicated that Fricks' mood deterioration was related to his inability to get his business off the ground, adding that Fricks failed to see that his problems caused by interpersonal difficulties and lack of social skills. (Tr. 428).

---

[8]Prozac.

18. Dr. Erin Bouquin[9] evaluated Fricks on October 5, 2000.[10] (Tr. 521). Although Dr. Bouquin's note contains some historical information not documented in other concurrent medical records[11], she noted that he suffered from depression, had been diagnosed with manic depression, was seeing Dr. Barry Weinstein, and that he took medications for his mental condition[12]. Dr. Bouquin indicated that Fricks had a flat affect and depressed mood, and included depression in her assessment of his condition.

19. Dr. Weinstein saw Fricks on October 26, 2000. (Tr. 427). Fricks told him that he was spending twelve hours a day painting for an art show, and that his lack of success was due to insufficient money, no car and defective equipment. Dr. Weinstein stated that Fricks' mood dysfunction was minimal and stable, with no signs of hypomania or depression. He indicated that Fricks' interpersonal problems and defensiveness precluded his success. He encouraged Fricks to attend regular psychotherapy sessions. Dr. Bouquin evaluated Fricks on the same day. Fricks told him that he continued to have "difficulty with his computer and other things that surround his ability to work," but that he was doing well. (Tr. 519).

20. Dr. Weinstein noted a mild increase in Fricks' depressive symptoms on November 30, 2000, following the initial denial of Fricks' claims for DIB and SSI benefits. (Tr. 426). On December 28,

---

[9] Dr. Bouquin is a Family Practice physician. http: www.lapho.com/

[10] Although this is the first note in the administrative record from Dr. Bouquin, Fricks listed her as a treating physician in his disability report dated August 3, 2000. (Tr. 16, 120).

[11] ". . . He was off is medications for some time and subsequently went into deep depression. . . . He was displaced during a fire, and at that time, he lost his medical care. In June, he did not have any medications." (Tr. 521).

[12] Dr. Bouquin indicated that Fricks took Depakote for manic depression, Prozac for depression and amitriptyline for insomnia. (Tr. 521).

2000, Dr. Weinstein attributed Fricks' continued problems to personality issues, stating that his mood was not a major factor. (Tr. 420).

21.     On January 25, 2001, Fricks told Dr. Weinstein that he was applying for jobs as a web site designer or illustrator.  He complained of dejection and increased sadness due to unemployment and his sense that no one appreciated his art work.  He denied other symptoms of depression.   Dr. Weinstein decreased Fricks' dosage of Nortriptyline and indicated that he would increase the dosage of  Prozac if depression increased.  (Tr. 418).

22.     On March 1, 2001,  Dr. Weinstein  assessed Fricks' mood as level.  (Tr. 412).  No changes were noted on March 29, 2001.  (411)

23.     On May 14, 2001, Fricks was seen by Michael Smith, Phd., a counselor at LAFC.  He appeared depressed with poor eye contact, and expressed some paranoid thinking. (Tr. 544).

24.     He saw Dr. Bouquin one week later. He advised her that he was not seeing Dr. Weinstein as much as before, and that he had decreased his dosage of Depakote.  He complained of difficulty concentrating on his work.  Dr. Bouquin indicated that his manic depression significantly impaired his ability to maintain responsible employment, that he appeared to cycle at 3 months intervals  from mania to depression, and that he might be on an  upswing. (Tr. 515).

25.     Fricks returned to Dr. Bouquin on August 22, 2001, with complains of arm pain.  He indicated that he had been increasing his activity level, had stopped taking Depakote and was no longer seeing Dr. Weinstein. Dr. Bouquin prescribed Zyprexa[13] to replace Depakote and encouraged him to see a counselor.  (Tr. 514).

26.     Fricks returned to Dr. Smith on September  4 and September 27, 2001.   On September 4,

---

[13]Zyprexa is used in the treatment of bipolar disorder.   http://www.pslgroup.com/dg/10981e.htm

he indicated that he was receiving VA disability benefits, and was more relaxed and less anxious. Dr. Smith felt Fricks was not a good candidate for counseling since he had no treatment goals and was stable on his medication. (Tr. 543). On September 27, Fricks was pleasant and appeared stable. He left the counseling session early and no treatment plan was developed. (Tr. 542).

27.     On October 22, 2001, Dr. Bouquin noted that Fricks was doing well with calmer mood and affect than in the past. (Tr. 547).

28.     The last medical record in the administrative record is a visit to Dr. Bouquin on January 29. 2002. (Tr. 547-548). He complained of increasing depression. She felt that he mood was more depressed than usual, but that his affect was normal, he was fully oriented and had no suicidal or homicidal thoughts. She placed him on a new medication and stated that the had become "destabilized in his current condition and is unable to work productively in society . . ." (Tr. 548).

Evaluation of Medical Evidence by Agency Psychologist

29.     Dr. LeRoy Gabaldon reviewed the medical records on behalf of the Commissioner. In a Psychiatric Review Technique form dated November 5, 2000, he stated that Fricks suffered from depression that did not meet the severity required for a Listed impairment. (Tr. 236-245). In his narrative evaluation, Dr.Gabaldon stated:

> Mr. Fricks alleges to be unable to work due to his depression. The records do support his allegation of being depressed. However, he does indicate that day-to-day, he is able to function. He does admit to frequent social problems. There is no evidence of ongoing thought disorder nor of severe cognitive limitation. His treating psychiatrist does note stable mood. Mr. Fricks has the capacity to understand/remember. He may have some limited capacity to concentrate/attend, to socialize and to adapt.

(Tr. 252).

In a Functional Capacities Evaluation form, Dr. Gabaldon indicated that Fricks' had moderate

limitation in several activities related to these areas of functioning. (Tr. 250-251). These specific activities are listed at page 17, *infra.*

### Report of Gerald Belchick PhD.

30. At the request of Fricks' attorney, Gerald Belchick, a rehabilitation consultant with a Ph.D. in guidance and counseling, reviewed the residual functional capacity prepared by Dr. Gabaldon. In an undated report that was presented at the administrative hearing, Dr. Belchick discussed the term "moderate limitation," contained in the Functional Capacities Evaluation, which he stated did not have an absolute definition. (Tr. 159-163). He stated:

> If we can agree that the term "moderate" means some where between 1/3 and 2/3's of the time or somewhere in the middle or more than 1/3 but less then 2/3rds, then we can begin to get a handle on how limiting "moderately limiting" is.
>
> In the MRFC (Mental Residual Functional Capacity), there are some nineteen (19) areas that are subject to being ranked "Not Significantly Limited", "Moderately Limited" and "Markedly Limited." . . . (Some of the) items listed would and do affect the worker, the work place and a workers ability to function successfully.

(Tr. 169).

Dr. Belchick went on to state that based on Dr. Gabaldon's finding of moderate limitation in nine areas of functioning [See p. 17, infra], Fricks would not be able to maintain competitive employment. (Tr. 161).

### Sequential Evaluation Process

31. The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled. *Williams* 844 F.2d 748, 750-51 (10th Cir.1988) (citing §20 C.F.R. 404.1520). The process stops if the Commissioner is able to determine at a particular step that a claimant is, or is not, disabled.

32.     In step one, the Commissioner determines whether the claimant is presently engaged in substantial gainful activity. If a claimant engages in such activity, the claimant is not disabled. *Williams*, 844 F.2d at 750-51. In his narrative discussion, the ALJ deferred on this issue, but subsequently found that Fricks had not engaged in substantial gainful activity since his alleged date of onset of disability. (Compare Tr. 18 with Tr. 25).

33.     In step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. If the claimant's medical impairments are not severe, the claimant is not disabled. Id. The ALJ determined that Fricks had a unspecified medically severe mental impairment, which did not meet the diagnostic criteria for bipolar disorder or any other affective disorder. (Tr. 18,25).

34.     Next Commissioner determines whether the impairments are equivalent to one of a number of listed impairments. If the impairment is found to be equivalent to a listed impairment, the claimant is considered disabled. Id. The ALJ found Fricks' impairment was not equivalent to a listed impairment, and Plaintiff does not contend otherwise.

35.     The fourth step of the sequential evaluation process is composed of three phases. First the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC)[14], and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At

---

[14]Residual Functional Capacity is an administrative finding of what an individual can still do despite his limitations, and is based on all the relevant evidence, including a claimant's description of his limitations and observations by treating or examining physicians and other persons. See 20 C.R.F. §§ 404.1545(a); 416.945(a).

each of these phases, the ALJ must make specific findings. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.1996). The ALJ found Fricks had the RFC for at least medium, non-public work with limited contact with others which prevented him from returning to his past relevant work [15] Plaintiff contends that errors made by the ALJ in assessing his mental RFC taint the findings made in the fifth step.

36. At the fifth step, the burden shifts to the Commissioner to show the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. Id. (Tr. 25). The ALJ found that Fricks could perform five jobs, identified by a vocational expert, which were available in substantial numbers in the regional and national economies.

37. Plaintiff contends that ALJ made errors in (1) assessing his RFC, (2) ignored substantial evidence of record, (3) posed an incomplete hypothetical question to the vocational expert, and (4) ignored the vocational expert's opinion.

38. I find that the ALJ's assessment of Fricks' RFC is not based on substantial evidence, and that he did not apply correct legal principles in evaluating the opinions of Fricks' treating physician. Because this matter must be remanded for reassessment of Fricks' mental RFC, I do not reach the remaining issues.

---

[15]The ALJ also included postural limitations that are not pertinent to this appeal. Citing to the Contract with America Advancement Act, Pub. L. 104-121, §150(a)(1), (b)(1) (codified as amended at 42 U.S.C. §§423(d)(2)(C), 1382c(a)(3)(J) (1997), the ALJ, in his narrative discussion, referred to Fricks' use of alcohol, which he stated had "interfered with treatment," and further stated that there was "no indication that (Fricks) was unable to work due to the severity of his psychological symptoms, absent the effects of alcohol." (Tr. 18-19). The Contract with America Advancement Act is not implicated unless the ALJ finds that a claimant is disabled. Only if that "condition precedent" is established, does the ALJ assess the role alcohol abuse plays in the demonstrated disability. *Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir.2001). Because the ALJ did not find Fricks disabled, the Contract with American Advancement Act is not implicated.

Standard of Review

39. The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. *42 U.S.C. §405(g)*. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . " *Id.* I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether correct legal standards were applied. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence is more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable man might accept to support the conclusion. *Gossett v. Bowen,* 862 F.2d 802, 804 (10th Cir. 1988). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992). I will not reweigh the evidence, but will examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision in order to determine if the decision is supported by substantial evidence. *Glenn*, 21 F.3d at 984.

Discussion

40. The ALJ discounted the diagnosis of bipolar disorder. (Tr. 20-21). Bipolar disorder, a mood disorder[16], is clearly substantiated in the records of Dr. Weinstein. However, Dr. Weinstein, the specialist with the longest treatment relationship with Fricks, repeatedly stated that properly medicated, Fricks' mood was stable (Tr. 450, 482, 43, 451, 437, 434, 429, 427, 420, 412). Because an impairment that can reasonably be remedied or controlled by treatment cannot support a finding of disability, *Pacheco v. Sullivan*, 931 F.2d 695, 698 (10th Cir. 1991); *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985), I find that the ALJ rejection of the diagnosis of bipolar disorder *per se*

---

[16]See DSM-IV at 20.

14

to be harmless.

41.     Although substantial evidence supports a finding that Fricks' mood disorder was stable on medication, Dr. Weinstein indicated that Fricks also suffered from paranoid ideation, and consistently stated that personality issues and interpersonal problems prevented Fricks from functioning successfully (Tr. 450, 454, 449, 448, 430, 428, 427, 420).  Regardless of the term used to describe Fricks' mental disorder, whether it be bipolar disorder, mood disorder, paranoia, personality issues or interpersonal problems, the ALJ must make specific findings  addressing how Fricks' mental disorder reduced his RFC.  *Winfrey v. Chater, supra*,

42.     Review of the ALJ's  entire decision reveals five factors upon which he assessed Fricks' mental RFC.  As noted, substantial evidence supports some but not all of the ALJ's rationale.

•       *There is no evidence that Fricks' mental condition worsened in November 1993, when he claimed onset of disability.*

        Fricks was committed for inpatient psychiatric care in  January and February 1994, when he exhibited depression, anger, suicidal ideation and suicidal gestures.  He was considered a danger to himself and others.   (Tr. 187, 297). This is substantial evidence that his mental condition had worsened around the time of this alleged date of onset of disability, and there is no other evidence of record to the contrary.

•       *Despite medication side effects that caused him to be sleepy and forgetful, with concentration difficulties and problems with social functioning, Fricks attended college courses and/or performed odd jobs from April 1994 through June 1999. (Tr. 19-21, citing to Tr. 112, 118, 60-61, 113).*

        Although findings supported in the record, they are so incomplete as to be misleading. The evidence is  uncontroverted that during the four years he attended college classes, Fricks earned only 40 credit hours.  (Tr. 61).

- *Fricks' psychological treatment records do not reveal significant concerns regarding his ability to function. (Tr. 21, citing to Tr. 297-299 - Discharge Summary, 1994 psychiatric inpatient admission; citing to Tr. 236-253 - Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment prepared by Dr. Gabaldon).*

The Discharge Summary cited by the ALJ expressed concern about Fricks' personality profile, describing him as chronically hostile, defensive, with poor impulse control, exploitive, argumentative, irritable, obsessive, suspicious, critical of others, demeaning, narcissistic, suspicious, self-indulgent and resentful.[17] On discharge, his prognosis was considered guarded. Nonetheless, he was given a GAF score of 70, indicating that he was functioning pretty well. Contrary to the ALJ's representation, the Psychiatric Review Technique form prepared by Dr. Gabaldon is not a treatment record. Nevertheless, it must be considered and is entitled to the weight given to expert opinion evidence of nonexamining sources. See SSR 96-6p, 1996 WL 374180, at *1 & *4. Contrary to the ALJ's conclusion, Dr. Gabaldon did express concern about Plaintiff's ability to function. In the narrative portion of his review, he stated that Fricks may have some limited capacity to concentrate/attend, socialize and adapt. (Tr. 252). He identified depression as the cause of mild restriction of activities of daily living, moderate difficulties maintaining social functioning and mild difficulties in maintaining concentration, persistence and pace. (Tr. 246). In the Residual Functional

---

[17]Many of these personality traits are evidenced in later treatment records: No relationships (Tr. 479); Pattern of conflict with others (Tr. 476); More cynical than previously (Tr. 472); Lonely and isolated. (Tr. 472); Drinking, surly (Tr. 467); Drinking a lot, dislikes gay community, feels discriminated against (Tr. 464); Blames others for his situation (Tr. 463); Claims racial discrimination in sale of art work, restless, agitated, paranoid, angry, scattered , doesn't like Dr. Weinstein because "he can look right through you" (Tr. 457-458); Angry and unkempt (Tr. 454); Paranoid ideation (Tr. 450); Becomes hyper-defensive when challenged (Tr. 448); Chaotic and angry. Tr. 444); Disgruntled, depressed, angry (Tr. 433);Feels he is experiencing racial discrimination (Tr. 441); Angry, feels world out to get him (Tr. 439-440); Blames others for his problems (Tr. 432).

Capacity Assessment - Mental, Dr. Gabaldon indicated that Fricks was moderately limited the following areas:

> Activities related to sustained concentration and persistence:
>
>> Moderately limited in ability to maintain attention and concentration for extended periods.
>>
>> Moderately limited in ability to work in coordination with or proximity to others without being distracted by them.
>
> Activities involving social interaction:
>
>> Moderately limited in ability to interact appropriately with the general public.
>>
>> Moderately limited in ability to accept instructions and respond appropriately to criticism from supervisors.
>>
>> Moderately limited in ability to get along with coworkers or peers without distracting them or exhibiting behavioral problems.
>
> Activities related to adaptation:
>
>> Moderately limited in ability respond appropriately to changes in the work setting.
>>
>> Moderately limited in ability to be aware of normal hazzards and take appropriate precautions.
>>
>> Moderately limited in ability to travel to unfamiliar places or use public transportation.
>>
>> Moderately limited in ability to set realistic goals or make plans independently of others.

(Tr. 250-251).

- *The Vocational Expert testified that Fricks' recent college study reveals that he is able to function in a work setting. (Tr. 23).*

   The vocational expert never made this statement. (Tr. 63-72). To the contrary, when asked to assume the combined moderate limitations listed in Dr. Gabaldon's Residual

17

Functional Capacity Assessment - Mental, the vocational expert agreed with Dr. Belchick's opinion, and testified that all jobs would be eliminated.[18] (Tr. 68).

- *Because Dr. Bouquin did not treat Fricks for his psychological problems other than to prescribe medication, and because no similar opinion was expressed by other mental health care providers, Dr. Bouquin's opinion that Fricks was unable to work productively in society was not entitled to the weight given to treating physicians. (Tr. 22).*

> The opinions of treating physicians are entitled to special deference:
>
> A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physicians's report, not the other way around.

*Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir.1995) (citation and quotation omitted).

> In assessing the opinions of treating physicians, the ALJ must consider:
>
> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 290.

It appears that the ALJ discounted Dr. Bouquin's opinion because she was not a specialist in psychology or psychiatry (factor 5) and limited her mental health care of Plaintiff

---

[18] The court recognizes that the ALJ stated at the administrative hearing that he did not accept the limitations check-marked by Dr. Gabaldon in the Residual Functional Capacity Assessment - Mental, and would rely instead on the narrative portion of Dr. Gabaldon's assessment. (Tr. 70). In his decision, the ALJ stated that he had "carefully considered the opinions expressed by . . . medical experts who had reviewed Claimant's records in the State agency." (Tr. 22.) He did not reject Dr. Gabaldon's assessment of moderate limitation in the areas of function the vocational expert found would eliminate all jobs.

to prescribing medication. (factor 2). Dr. Bouquin treated Fricks on at least seven occasions over a fifteen-month period. (factor 1). On approximately half of her office visits with Fricks, she described signs and/or symptoms of depression (Tr. 521, 547) or mania (Tr. 515) (factor 2). On her last visit with Fricks she opined that he was "currently" destabilized and unable to work productively in society. (Tr. 547). Although Dr. Weinstein attributed Fricks' functional difficulties to personality problems rather than bipolar disorder, he expressed views similar to Dr. Bouquin's on several occasions (factors 3 and 4):

| | |
|---|---|
| Sept. 21, 1999: | Chronic psychological/pers factors still seems to contribute to lack of I-P (interpersonal)/vocational success. (Tr. 449). |
| June 30, 2000: | Personality and inter-personal precluding any success . . . some grandiose notions re his progress painting. No follow through with even short term goals. (Tr. 430). |
| Sept. 28, 2000: | Fails to see that his problems caused by interpersonal difficulties and lack of social skills. (Tr. 428). |
| Oct. 26, 2000. | Although mood dysfunction minimal and stable, interpersonal problems and defensiveness preclude (vocational) his success. (Tr. 427). |

42. In sum, Dr. Bouquin, though not a specialist in psychology or psychiatry had a long term treatment relationship with Fricks. She evaluated his mental state on several occasions. Her opinion that he was unable to work productively was not inconsistent with that of Dr. Weinstein, a treating psychiatrist. *See Frey v. Bowen*, 816 F.2d 508, 514-15 (10th Cir.1987). Consequently, her opinion should have been given substantial weight. The ALJ did not apply the correct legal standards in considering and assessing her opinion.

43. Administrative agencies must give specific reasons for their decisions. *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir.1988). The court concludes that the reasons stated by the ALJ to support

his RFC finding are not supported by substantial evidence or were inconsistent with established legal standards.

**IT IS ORDERED** that Plaintiff, David L. Fricks' Motion to Reverse is granted, and this matter is remanded to the Commissioner of Social Security for additional proceedings. The Commissioner shall reassess Fricks' Mental Residual Functional Capacity. The Commissioner shall give controlling weight to the opinions of Fricks' treating physicians, to the extent those opinions are well-supported and not inconsistent with other evidence of record. If a treating physician's opinion, or any portion thereof, is rejected, the Commissioner shall state specific, legitimate reasons for doing so. Further, if the ALJ continues to reject the assessment of mental residual functional capacity performed by Dr. Gabaldon, he shall state his reasons for doing so.

RICHARD L. PUGLISI<br>
UNITED STATED MAGISTRATE JUDGE<br>
(sitting by designation)